IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Jamaal Nelson, | ) | C/A. No. 2:23-1634-RMG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **ORDER AND OPINION** |
| Experian Information Solutions, Inc., *et al.*, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Before the Court is Defendant Experian Information Solutions, Inc. ("Defendant")'s motion to exclude the testimony of Plaintiff's expert Douglas A. Hollon (Dkt. No. 37). For the reasons set forth below, the Court grants in part and denies in part Defendant's motion.

I. **Background**

Plaintiff brings this action under the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et sec.* ("FCRA"). Plaintiff alleges that around February 2023 he applied for housing with Younger Developments in Texas. (Dkt. No. 1 at 2). Plaintiff alleges he was denied housing on February 7, 2023 because Defendant's consumer credit report reported Plaintiff as "Deceased" on a Capital One tradeline. (*Id.* at 3). Plaintiff alleges that Defendant failed to investigate the alleged inaccuracy. (*Id.*). Plaintiff alleges that due to his being denied housing in Texas he had to take a lower paying job in Florida where he paid higher rent. (Dkt. No. 43 at 21). Against Defendant, Plaintiff brings claims for (1) violation of the FCRA for failure to assure maximum possible accuracy and (2) violation of the FCRA for failure to investigate.

Defendant now moves to exclude the purported expert testimony of Douglas A. Hollon. (Dkt. No. 37, 45). Plaintiff opposes. (Dkt. No. 43).

Defendant's motion is fully briefed and ripe for disposition.

**II.     Legal Standard**

Under Fed. R. Evid. 702, the Court acts as a gatekeeper "to verify that expert testimony is based on sufficient facts or data." *E.E.O.C. v. Freeman*, 778 F.3d 463, 472 (4th Cir. 2015). The expert testimony must be shown to be "not only relevant, but reliable." *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 589 (1993). "Because expert witnesses have the potential to be both powerful and quite misleading, it is crucial that the district court conduct a careful analysis into the reliability of the expert's proposed opinions." *United States v. Fultz*, 591 Fed. Appx. 226, 227 (4th Cir. 2015).

The trial court must ensure that (1) "the testimony is the product of reliable principles and methods," (2) the "expert has reliably applied the principles and methods to the facts of the case," and (3) the "testimony is based on sufficient facts and data." Fed. R. Evid. 702(b), (c), (d). "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid," *Daubert*, 509 U.S. at 592-93, and whether the expert has "faithfully appl[ied] the methodology to the facts." *Roche v. Lincoln Prop. Co.*, 175 Fed. Appx. 592, 602 (4th Cir. 2006). Additionally, the Court must evaluate any proposed expert testimony under the standards of Fed. R. Evid. 403 to determine whether the probative value of the evidence, if relevant, is substantially outweighed by the risk of misleading or confusing the jury.

Factors to be considered in assessing the reliability of technical or scientific evidence include "whether a theory or technique ... can be (and has been) tested," "whether the theory or technique has been subjected to peer review and publication," the "known or potential rate of error," the "existence and maintenance of standards controlling the technique's operations," and whether the theory or technique has garnered "general acceptance." *Daubert*, 509 U.S. at 593–94.

The *Daubert* factors are not exhaustive and illustrate the type of factors "that will bear on the inquiry." *United States v. Hassan*, 742 F.3d 104, 130 (4th Cir. 2014). Courts have also considered whether the "expert developed his opinions expressly for the purposes of testifying or through research conducted independent of litigation." *Wehling v. Sandoz Pharm. Corp.*, 162 F.3d 1158 at *3 (4th Cir. 1998); *Daubert v. Merrell Dow Pharm. Inc.*, 113 F.3d 1311, 1317 (9th Cir. 1995) (on remand).

The proponent of the expert testimony carries the burden to establish the admissibility of the testimony by a preponderance of the evidence. *Cooper v. Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001). The Fourth Circuit has held that Rule 702 excludes expert testimony on matters within the common knowledge of jurors. *Persinger v. Norfolk & W. R. Co.*, 920 F.2d 1185, 1188 (4th Cir. 1990); Rule 702 (requiring that an admissible expert opinion be based upon "scientific, technical, or other specialized knowledge"); *Scott v. Sears, Roebuck, & Co.*, 789 F.2d 1052, 1055 (4th Cir. 1986) (noting by negative implication that "Rule 702 makes inadmissible expert testimony as to a matter which obviously is within the common knowledge of jurors because such testimony, almost by definition, can be of no assistance."). The admission of "common sense" expert testimony is dangerous because "the evaluation of the commonplace by an expert witness might supplant a jury's independent exercise of common sense." *Id.*

### III.    Discussion

The Court has reviewed Hollon's report in its entirety. Hollon's principal conclusion is that that Defendant "failed to follow reasonable procedures to assure maximum possibly accuracy" and that if Defendant "had reasonable procedures to assure maximum possible accuracy, it would have verified a deceased notation reported by a data furnisher before storing the information on an [individual's] file." (Dkt. No. 43-1 at 4).

To arrive at this conclusion, Hollon cites from Defendant's "Deceased Indicator Manual" wherein Defendant explains its "maintenance procedure" to "identify and remediate potentially incorrect deceased indicators that have been reported by data furnishers." (*Id.* at 11). Namely, when a data furnisher indicates a consumer is deceased, "[a]n algorithm searches and filters whether only a single data furnisher reports a deceased indicator for the consumer. If that consumer is not found in the Social Security Administrator's master death file; if the data furnisher first reported the deceased indicator more than 60 days, and if there are viable trades from any data furnisher, new non-collection trades created meaningful trade updates reported for the consumer after the deceased indicator was reported, an input file with the qualifying trade keys is created for maintenance. Maintenance is executed using a trade maintenance request (TMR) to update the ECOA Code X to ECOA Code 1 [not deceased]." Hollon states that Defendant's manual indicates "maintenance" is implemented on the "first week of each month." (*Id.* at 11). Hollon opines this procedure is unreasonable and "faulty" because Plaintiff's deceased notation—reported on January 17, 2023—should have been scrubbed at the beginning of April but was not scrubbed until April 26, 2023 and only, it seems, because of Plaintiff's efforts to correct his deceased status. (*Id.* at 11-12) ("In my opinion, with a dispute being initiated by Experian (ACDV) [Automated Consumer Dispute Verification][1], and by Experian relying on a faulty 'Scrub' procedure, Experian does not have reasonable procedures to ensure maximum possible accuracy.").

After a careful review of the parties' briefing and Hollon's expert report, the Court excludes Hollon's testimony as to whether Defendant's credit accuracy procedures are reasonable. As to the conclusion that it is not reasonable for Defendant to rely on data furnishers, (Dkt. No. 43-1 at

---

[1] In his report, Hollon does not cogently explain or define what an ACDV is. *See, e.g.*, (Dkt. No. 43-1 at 6).

4

4) (opining that if Defendant "had reasonable procedures to assure maximum possible accuracy, it would have verified a deceased notation reported by a data furnisher before storing the information on an [individual's] file"), Hollon does not articulate concrete factual materials or sources on which he bases his conclusion. *Nucor Corp. v. Bell*, No. C/A 206-CV-02972-DCN, 2008 WL 4442571, at *4 (D.S.C. Jan. 11, 2008) ("The Supreme Court has advised district courts to require more than the mere *'ipse dixit'* of the expert witness."). As to Hollon's opinion that the above describe maintenance procedure is "faulty," Hollon again cites no reports, research, or other reliable material in reaching this conclusion. Nor does he explain how his professional background, experience, or training allow him to arrive at either of the above conclusions. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (without a connection between the witness' knowledge and the particular conclusions drawn "there is simply too great an analytical gap between the data and the opinion proffered"); *Brown v. Auto-Owners Ins. Co.*, 121 F.3d 697 (4th Cir. 1997) ("In this case, Brown's expert offered nothing more than his subjective belief on the cause of the collapse.").

 At best, Hollon attempts to rely on his prior experience working for Defendant to reach his conclusions. For example, Hollon alleges that while he worked for Defendant, he observed that Defendant prioritized "costs of doing business . . . over doing what was right." (Dkt. No. 43-1 at 7) (citing Hollon's recollection that "in February and March each year there was excitement in the air around Experian about whether Experian was going to achieve EBIT [earnings before interest and taxes], because if EBIT was achieved that meant raises and bonuses for employees"). Hollon never explains concretely, however, how such financial incentives are relevant to his conclusion Defendant failed to follow reasonable procedures to assure maximum possible accuracy. *See also* Fed. R. Evid. 403.

5

Hollon also claims Defendant's dispute resolution system is "biased," "cost driven," and that his conclusion is supported by "[his] own personal experience." Hollon states that "[t]here is effectively nothing the consumer can do when Experian refuses to correct inaccurate items in his credit file" because Defendant accepts "results from the Data Furnisher at face value without performing any further investigation." (*Id.* at 6). As noted previously, however, Hollon never explains the factual materials on which he bases his conclusion that it is unreasonable for Defendant to rely on Data Furnishers.

Thus, for the reasons explained above, the Court excludes Hollon's opinions regarding the reasonableness of Defendant's procedures to ensure maximum accuracy in credit reports.

Last, Hollon opines to some limited degree on Plaintiff's damages. (*Id.* at 22) ("Plaintiff was denied housing because Experian reported him as deceased. Plaintiff spent time creating a dispute letter, paid postage for the dispute letter, and mailed a dispute letter to Experian. Additionally, consumer reports [and/or deceased notification] about Plaintiff containing the inaccurate information were sent to third-parties."). Hollon also opines about the economic difficulties consumers face due to "misreporting on a credit report." (*Id.* at 21). Further, in a declaration submitted with Plaintiff's opposition to Defendant's motion, Hollon attempts to explain why he is qualified to opine on the psychological impact of inaccuracies in a credit report. Hollon cites his training in the "Army Criminal Investigation Division" and "multiple personality and behavioral courses, including the Ennegram course and becoming a D.I.S.C. Certified Trainer." (Dkt. No. 43-2 at 4-5). Hollon also cites the dispute letters and telephone calls he read and listened to while working in the credit industry as proof of his expertise on emotional damages. Hollon admits, nevertheless, that he has not been "trained formally as a psychologist." *Id.*

As to Plaintiff's non-emotional damages, the Court excludes Hollon's testimony. Plaintiff can speak to his own damages and Hollon's recitation of Plaintiff's damages is unhelpful. *See United States v. Lester*, 254 F. Supp. 2d 602, 607 (E.D. Va. 2003) ("[I]n determining whether a particular expert's testimony is sufficiently helpful to the trier of fact to warrant admission into trial, the district court should consider whether the testimony presented is simply reiterating facts already 'within the common knowledge' of the jurors."). As to Plaintiff's emotional damages, the Court excludes Hollon's testimony as he is not qualified to proffer such opinions. "Moreover, his testimony will not assist the fact-finder because [Plaintiff] may testify about how the alleged credit reporting inaccuracies impacted him physically, emotionally, and economically, and about the time and energy he spent to resolve the alleged credit reporting inaccuracies." *Valenzuela v. Equifax Info. Servs. LLC*, No. CV-13-02259-PHX-DLR, 2015 WL 6811585, at *3 (D. Ariz. Nov. 6, 2015). The Court finds, however, that Hollon is qualified to speak, in general terms and as found relevant at trial, about the sort of damages that are typically caused by errors on credit reports.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's motion to exclude (Dkt. No. 37).

**AND IT IS SO ORDERED.**

s/ Richard Mark Gergel<br>
Richard Mark Gergel<br>
United States District Judge

June 27, 2024
Charleston, South Carolina